We have five cases on our calendar this morning, two patent cases from the PTAB, a patent case from a district court, a case from the Court of Claims, Federal Claims, and an employee case from the MSPB. The first case is SmartFlash v. Samsung, Apple, and Google, 2016-24-51, etc. Mr. Panel. Thank you, Judge Lurie. May it please the Court. I'd like to cover two issues this morning, whether the patents are covered business methods within the meaning of the statute, and whether the patents claim eligible subject matter within the meaning of Section 101. And at the outset, I'd like to address why this Court's decisions in Berkheimer and in Atrix strongly suggest that a fresh look at the patent eligibility issue is warranted here. Berkheimer holds that— What does fresh look mean? You mean challenge our own precedent? Your Honor, what I'm saying is that the decision there should not be entitled to collateral estoppel effect in this case, and the Court should indeed revisit that question, because the holding in the precedential decisions in Berkheimer and Atrix establish that whether a claim element or combination of elements is well understood, routine, and conventional to a skilled artisan in the relevant field is a question of fact. And in this case, the Board's finding that the SmartFlash patents were ineligible is contrary to that standard, because as we explained in our briefs, in our opening brief at 40 to 41, and in our reply brief at 19, it conflicts with the Board's determinations in these proceedings and in prior proceedings that the limitations of the SmartFlash patents are not obvious in light of the prior art. Indeed, the very limitations that SmartFlash— Can I double-check something with you? My understanding—and tell me if this is wrong—is that the prior art asserted for the 102-103 analysis was not actually the same as the sources that the Board relied on to find—let's just use the term—conventionality. I don't believe that's correct, Your Honor. In fact, some of the same patents that were cited, or certainly that were relied on by the—in its brief to suggest that these references were conventional, were, in fact, the same references that were rejected as a basis for initiating on obviousness or anticipation in prior proceedings. Didn't the Board rely for its conventionality finding on—let's call them admissions in your specification, and that was not part of the 102-103 case? It is—I think that the Board's analysis, and to the extent it relied on the admissions in what you refer to as admissions in the specification— Descriptions of what was known in the prior art and how we don't need to tell you how to do this because everybody knows that kind of thing. Well, that goes to whether certain of the elements within the—that were claimed that were part of the combination were known. And that's really—but, you know, the basis for the argument—the basis for the claim that there is a—that there is a nonconventional inventive concept involved in what is claimed here goes to the particular interaction of elements, the particular way in which the functionalities that are at issue were distributed within the network and were used within the—in the interactions of those elements in the system that was described. And that is what—that is certainly not something that was described in the specification as being conventional or known. On the contrary, the specification makes clear that the arrangement of elements that was described in the claims offered significant advantages that would permit the secure and convenient distribution of digital content in a way that would also provide for effective protection of the rights of the content owner. And that is what was unknown in the prior art. And I think that if you look at specifically what was found in the—some of the initiation decisions that are both part of this—part of this appeal, part of the record here and not part of the record here—for example, if you look in the appendix at page 722, there is a rejection of GRUS, one of the prior art patents that was relied on by the petitioners, as a basis for finding that one of the elements in the—was known previously. And what the board found in that—in the initiation decision was that the petitioner had failed to show sufficiently how the condition for accessing data written into the data carrier is dependent on the amount associated with the payment data forwarded to the payment validation system, nor does—Samsung in this case was the petitioner—explain that a person of ordinary skill would find such dependency obvious. This is— Mr. Panner, these are financial patents, are they not? I don't believe so, Your Honor. And that goes to the— Isn't the payment written all over them and isn't payment quintessentially financial? Your Honor, I think that the distinction here—and it really goes to the specific language that Congress chose for the—to address whether a patent is, in fact, subject to covered business method review. And what the statute says is that the patents must claim data processing or other operations used in the practice, administration, or management of a financial service. It is not enough merely that the patents allude to payment, but instead that the patents be claimed for an improvement in the financial operation. Payment isn't a financial service? The question is not whether payment is a financial service. There are financial services that are adjunct to the system that is claimed here. And so, for example, the invention of a novel payment validation system might well be—would in all likelihood be a covered business method if it weren't a technological invention. But the point here is that, as I think petitioners—as appellees actually concede in their brief, there is not—the patent does not go to an improvement in that payment validation system. You mount an attack particularly on Claim 11, but that's really irrelevant, isn't it, because the board also relied on Claims 1 and 4 in the initiation. I mean, there's several different initiations here, but on some of them, they relied on Claims 1 and 4, so Claim 11, having been used for some of the other initiations, is kind of irrelevant, isn't it? I don't think it's irrelevant, Your Honor, because what it goes to show is that the board was applying the wrong standard. So the board clearly thought, as it had said— No, but if they initiated properly, let's hypothetically assume on 1 and 4, the fact that you contend that they initiated improperly on Claim 11 doesn't have any consequence, does it? Well, I think that as to those—that initiation decision, that would in fact, under the ordinary — Well, what difference does it make? What difference does it make if they properly initiated on their 1 and 4? Well, Your Honor, as I've said, that it may not provide a basis for reversal of that entire proceeding, but what—the reason why we emphasized it in our brief and argued the point is that it is important to see that the board was applying the wrong standard. Their analysis with respect to Claim 11, which contains nothing that is even related to payment, goes to show that the standard was incorrect. Then there's no question that to prevail on these proceedings, we do need to be able to show that with regard to the claims that, as Judge Lurie pointed out, do refer to payment and payment data and payment validation, that that is nevertheless not within the definition as it is not, because the statute speaks very specifically— Well, could you explain that? I mean, it seems to me that at least the language used in, say, Secure Access and CiteSound and Blue Calypso is pretty readily satisfied here, because there is a financial element in at least one claim of each of the patents, the payment stuff. Now, so you're making a point that the statute requires more. Can you define what the more is, what this use in means? Yes. I think at a minimum for a patent to be used in a financial product or service, it would have to claim some improvement on the financial product or service. The service here is the secure and convenient distribution of digital content. It relies on existing financial infrastructure to achieve that, but it is not providing a financial product or service within the plain language of the statute. In our briefs, we've explained the distinction between the claims here and the claims that were at issue in Blue Calypso and CiteSound. And I think that Secure Access— And what is the difference? The difference is that in Blue Calypso, what was claimed was a method of providing a subsidy, which was—that is, the claim itself was attempting to improve a mechanism for rendering a payment. And in CiteSound, as we pointed out, the claims themselves referred to a step that involved transmission of money over wires. Therefore it involved an actual financial step. Here, the difference is that the— Payment isn't a financial step? But what's going on here—payment is not in itself a financial step in these patents, because what is going on in these patents is that payment data, payment validation, are used as a mechanism for controlling the secure distribution of the—of digital content. And for that reason, they are not used in, but instead depend on, existing financial products and services. And if I can— So what's the consequence, then, if it's not a CBM? We dismiss and you lose at the board? No, you dismiss and we win, Your Honor, because if they were not properly initiated, then all of the decisions would be nullity and they'd be vacated, and we would therefore live to continue to be able to pursue these patents. And again, I think it does— Can I ask you a question before your time starts running out? Oil states. Oil states, and I think every one of the other cases that we've had, involve IPRs, and I think it's true that in all the cases, including as presented by oil states in the Supreme Court, the grounds for cancellation, for unpatentability, were the same kinds of grounds that were available since July of 1981. CBMs on 101 are not like that, namely, all the patents issued since 1981 came with strings attached, we can reexamine 102, 103. There hasn't been anything like that, at least on the 101 grounds. Are you making an argument that that's a potential distinction between whatever the Supreme Court might do, we don't know what they're going to do, on IPRs and CBMs? Yes, Your Honor, I think that because, to the extent that the Court's reasoning, and I think that's why we were careful to preserve the argument that the Section 101 invalidation may raise an issue that's different from what would occur in an IPR involving other grounds for invalidation. But you don't dispute that the rationale that we have used in MCM extends to this case until the Supreme Court either reverses that, or narrows it, or something? Correct. And if I can return to the question of eligibility, because I think it does tie into the issue also of the coverage of the CBM statute. What the smart flash patents claim that is indeed an inventive concept is the specific way in which the use of, the way in which the data elements are organized on the data carrier and the interactions with existing payment validation systems and content delivery systems permits a different and better delivery of digital content to a user. And so, for example, the element that was found to be not disclosed in the prior art in the initiation decisions involved having a use rule on the data carrier that was dependent upon the amount of payment that was associated with the payment validation data. So it's an illustration of the way in which by storing the use rule on the data carrier, the use rule being dependent upon the amount of the payment validation. You get more if you pay more? Is there something more going on than that? I think there is something more going on, Your Honor, which is that because the use rule is stored on the data carrier, there's an ability to continue to control access consistent with the amount of payment and the payment validation data even when the data carrier is no longer connected to the system. So unlike, for example, a metering or a streaming system, there are advantages to being able to associate that use rule. Using that architecture involving the receipt of payment data, using the payment data to is a much more flexible system. It permits the payment validation, the provider of payment validation not to curate content. Contrary-wise for the provider of content not to have to implement its own payment validation system. Counsel, your time is up, including your rebuttal time, but we'll give you two minutes to rebuttal. Thank you, Your Honor. Mr. LaMocca. May it please the Court. I only have a few minutes, Your Honor, so I'll try to be brief. To address the CBM question, here we believe the board properly deemed the CBM patents and therefore instituted these proceedings. In fact, in response to Mr. Panner's points, the language used in a financial service and the language, an improvement, improving a financial service, we don't think that's consistent with what the prior case law has instructed us and is construed in the statute. For example, the Versada case made very clear that the statutory scope is not limited to something in the financial business. It doesn't have to be a banking transaction. It doesn't have to be an investment transaction. What about secure access? And secure access is consistent, Your Honor. If I take you to the secure access decision, I think it pretty clearly articulates that the patents that were deemed CBM patents in Blue Calypso, in Versada, as well as in SightSound, all of those were good enough to qualify as CBM patents. But there was nothing financial in the secure access patent, was there? Yeah. The language wasn't there. But nevertheless, they found that those claims, you're right, in the secure access patent, the language financial or payment or something like that, or online sale was not in the claim. And what had happened in that case was the specification talked about using its authentication. I think it was a website authentication type. But your point here is that payment is in these claims. Exactly, Your Honor. In these claims, and I think almost every... Which of the cases is it? Versada, Blue Calypso, SightSound? Again, Mr. Panner's point is simply requiring payment in the claim doesn't quite do it. There has to be some contribution of the invention to the facilitating of the payment, as opposed to using the payment to facilitate something else like the delivery of the service in exchange. I don't think we agree with that point, Your Honor. I think if we look at the Versada case law and we look at even SightSound and even secure access, it says in secure access, the financial in nature, as in Blue Calypso, was an accurate overall description of the challenge claims. Necessarily, quote, the statutory definition of a CBM patent requires that the patent have a claim that contains, however phrased, a financial activity element. Right, but the word there is required. So that's a necessary condition, and we held it wasn't met there. Mr. Panner's point is that's not a sufficient condition. So what cases say that merely reciting something that is clearly financial, but not in a way that embeds the technological improvement in the facilitation of that payment is enough? Is that SightSound? Well, SightSound is about an online, an electronic sale. And really, that's what we have here. I mean, think about what we've got. If in the old days, before the internet, if I went into a store and I wanted to purchase a DVD or an audio, I had to pay for it. I could pay for it with cash, and they would wait until I gave them the money before they gave me the audio tape, or I could use a credit card. And if I scanned the credit card, what would they do? They would validate payment by the scanning of my credit card, and once payment was validated, they would authorize release of the audio tape to me, right? Now, we've added, what have we added? They've kept you at arm's length. Now we're in the internet. And what do these claims talk about? Validating payment prior to authorization to access to the data that they can download. If I want some music or a video off the internet, and it's posted somewhere, and I want to access it, what do these claims do? What do these inventions do? They say, oh, you have to first authorize payment, and once you authorize payment, we will give you permission to access what you want. That is exactly what is in Sitesound, an electronic sale. So I don't see that there's any difference between these claims and the claims in prior cases where this court has held sufficiently qualifies as CBM patents. I mean, that's a concrete example. As far as the test goes, I think, you know, appellant's point is they believe that the PTO board didn't follow the proper test. On the contrary, the board tracked the test laid out in Versada very closely. They tracked the test laid out, even in Sitesound, because they said it's a financial activity element. Here it is. It's financial in nature. Those are the exact types of words and language that was used to interpret the statute and apply the statute in those prior cases. So I don't think there's a problem here that these were properly instituted. I think they were properly instituted, Your Honor. That was the limit of the issue that we raised in our brief. We just wanted, and we use our brief kind of as a roadmap for the court to point to all the aspects of the administrative record reflecting that that test was applied. If there's no further questions, I'll take my seat. Thank you, Mr. Lamarco. Mr. Perry. Thank you, Judge Lurie, and may it please the court. This is a case about collateral estoppel. This court has decided the eligibility question. Judge Lurie, you were on the panel. When Mr. Panner says, take a fresh look, what he says is that this panel should overrule that panel. He's saying that this court got it wrong the last time. He filed a petition for rehearing. It was denied. He filed a certiorari petition. It was denied. There is no reason to go over this again. The B&B Hardware Court case from the Supreme Court just reminded us of last year. That was four claims, right? It was four claims, Your Honor, and it was their obligation, the patentee's obligation, to come forward with a material difference between those claims and these claims. That's the upshot, for example, of Judge Dyke's opinion for the court in Max Linear just recently. We've submitted a 28-J letter on this. Collateral estoppel applies to related patent claims. Remember, these are all from a common application. They all have a common specification. I don't think, I don't understand Smart Clash to be arguing that the ordinary requirements for issue preclusion, ordinary requirements, don't apply, that there's any difference. I think he's saying something has happened in the interim, and one of the standard exceptions to issue preclusion is set forth in Dow v. Nova and lots of other cases. A sufficiently great change in the law that the result would have to be different. Two answers, Judge Trotter. So why has there not been such? So I agree with the court's first point, of course. They have not argued that there's any material difference between the claims. So then the only question, so section 27 of the restatement, standard issue preclusion applies. The only question is whether there's an exception. Section 28-2 is the only exception they've invoked, the change in law exception. The only change in law cited is Berkheimer and Atrix. There are two problems with that to start. First, 28-2 only applies to decisions from a higher court, the unbanked court of the Supreme Court. It doesn't apply to coordinate decisions at all. So there's no exception to collateral estoppel for coordinate decisions. So they can't even get into 28-2. If they could, they would have to show under the first prong of Dow Chemical, which, of course, Judge Dyke is very familiar with, that there's been a change in law. Judge Toronto was on the panel in both Berkheimer and Atrix and can tell us better than I can. A decision of a panel is a decision of the court, and it doesn't help to point out who offered them. Very well, Your Honor. My point there is whether there was a change in law or not, the Berkheimer and Atrix panel said they were not changing the law. The panel decisions in those cases said they were not changing the law, so 28-2 doesn't apply. The third point, and probably the most important one, is let's assume they changed the law. Mr. Panner's point is that, therefore, non-obviousness becomes the relevant fact that requires overruling the previous panel decision in this case. That's wrong for three reasons. First, Mr. Panner himself forfeited it in this courtroom on December 7, 2016. Judge Lurie, you asked him, does inventive step essentially mean non-obviousness? And Mr. Panner responded, doctrinally, this court has said it's not the same as non-obviousness. And Chief Judge Prost asked him a similar question, and he again said they're not the same thing. So the argument they're now making, he waived in Smart Flash 1, which presumably is why the panel didn't address it in the opinion. Second, even if it were not waived, it is legally irrelevant. The doctrine of non-obviousness, or novelty for that matter, is separate from 101. The Supreme Court said that in Fluke, in Funk, in Deer. It reiterated it in Mayo. Can you now articulate a couple of sentences of your own explaining the difference? Of course, Your Honor. Novelty goes to whether it is new in the world. And 101 says whether it is new in a sense that goes to inventiveness. Step two, in particular, requires not only that something be disclosed for the first time, but that it is something that is allowed to be patented. And the reason the Supreme Court has separated those two lines of analysis, and this Court made that clear in the IP Engine case, for example, is that something may well be novel and non-obvious, but nevertheless ineligible. And we can test this very simply because... Right, so it seems to me conceptually, I understand quite easily how one can have novel and non-obvious innovations in the abstract realm, and that wouldn't count. Correct. Is this that case? This is that case, Your Honor. And the Court has already held that this is that case in the SmartFlash I decision. In other words, the Court... These are pre-Bilski patents. These were prosecuted under the old guidelines. They wouldn't be issued today. The Court in the SmartFlash I case looked at these patents and said they are directed only to an abstract element, the payment of money for content, and they add nothing. The specification itself discloses that these are conventional elements arranged in a conventional fashion, performing their routine functions, and therefore they are simply do-it-on-a-computer claims. They are Alice claims through and through. They are Bilski claims through and through. And that's what this Court recognized the first time around. And non-obviousness is not relevant to that determination. In the return mail case, the Court confronted exactly this question. A case out of the PTAB is a declination of institution on 102 and 103 inconsistent with an ineligibility under 101. And the Court said, as a matter of law, it is not. And that is the same position we have here. And then factually, even if we could get over the waiver and over that legal irrelevance, Berkheimer and Atrix are essentially prematurity cases, right? Atrix is a motion to dismiss case and Berkheimer is a motion for summary judgment case. And in both of those cases, the Court said that there were disputed issues of material fact that precluded resolution at that stage of the 101 question. This is not a motion to dismiss case. SmartFlash has had two trials on the merits on these patents, one in District Court and one in the PTAB. In the PTAB, in fact, the SmartFlash objected... Excuse me, Ron. SmartFlash, the petitioners put in significant evidence on step two. And Judge Toronto, to answer your question, it was different than the 102 evidence. Exhibit 1315, for example, in the PTAB was offered only for step two and not for obviousness. Then there were others, but that's one example. Is that that European thing? That's one of the, it's not the European patent, it's one of the other prior art references. And SmartFlash objected to the evidence on step two as irrelevant. And the board, at Appendix 641 in one of the final written decisions and elsewhere, overruled that objection and said that the evidence was relevant to step two, and then relied on that evidence as confirmatory of what the specification itself disclosed, which is that these are not eligible patents. So that there is no disputed question of fact. Atrix and Berkheimer only say that if there's a disputed question of material fact, and we of course would dispute that obviousness is a material fact, but even if it were, there is no dispute because they had a trial in the PTAB. The PTAB considered all the evidence. SmartFlash didn't put in any evidence on step two other than the specification and the claims. And so there's no disputed question of fact in this case. So that the only exception that they have invoked to collateral estoppel 28-2, the change in law, the only cases they've cited, Berkheimer and Atrix, which apply to disputed questions of material fact, simply don't get them there because in this case, there is no disputed question of material fact. The board decided the facts, and they haven't challenged them, and it's not material, and as I said, SmartFlash waived it the first time around. So with that exception gone, we're right back into B&B hardware and the ordinary rules of collateral estoppel, which is to say this court doesn't sit to revisit decisions it has already made. As the Supreme Court told us in B&B hardware, it wastes litigants' resources and adjudicators' time. And this is a case, an example of that. And Judge Lurie, you asked my colleague, you know, what happens if the institution decisions are invalidated? He said, well, they're gonna go and enforce these patents in district court against somebody else. Well, that's again what collateral estoppel is designed to enforce. These patents are done. This court has decided the case. We should not be here today, and this is a case in which this court ought to, we submit, make clear that its determinations are binding. One more point on this. This is a problem of SmartFlash's making. When the two proceedings were proceeding in parallel, Apple came to this court and asked for a stay of the district court proceedings so that the PTAB could go first. The court denied the stay. It agreed with SmartFlash. Then when the district court appeal was pending, Apple came to this court and asked to coordinate the appeal so that they could be decided at the same time. SmartFlash opposed that motion, and this court agreed with SmartFlash and said the district court appeal should go first. So the district court appeal went first. And then SmartFlash lost. And then SmartFlash dragged its feet. It took every possible day to file for rehearing and to file its notice of appeals and so forth in the PTAB proceedings in the hopes that something would change so that it could come to this court and essentially ask for rehearing of the decision it already lost. It's over now. It's done. They lost. They lost rehearing. They lost certiorari. This court should not go back and give them a second bite at the same Apple. Thank you very much. Thank you, Mr. Perry. Mr. Panner, you have two minutes for rebuttal. Thank you, Your Honor. I appreciate that. I do think that we are, I agree with Mr. Perry with respect to the fact that. Are you, on final estoppel, are you arguing that the claims that were invalidated in the earlier case are revived? No. No. No. We have not, that's ratio to conduct. Just that the decision can't be applied to the That the court. To the claims that weren't involved in the earlier case. Exactly, Your Honor. And I do think that the argument has been well aired that the point is that there has been a significant development in the law, a precedential decision of this court that ought to be applied. The court ought to, ought equitably to consider that. Does that mean that every single one-on-one case that we decided before Berkheimer and Atrex is no longer flat all estoppel? Not at all, Your Honor. Because it would really depend on the nature of the decision and whether there were, in fact. In other words, the question, first of all, it would not revive any final judgment by any stretch. That's not what we're arguing with regard to, in this case. What we're arguing in this case is that because there are claims before you and an administrative decision before you that has not been reviewed before, the question is whether the court ought to. I'm not sure I'm really answering my question. My question is, does your argument lead to the conclusion that every single case before those two decisions in Berkheimer and Atrex is no longer flat all estoppel? If, I certainly, the implication is that if the basis for the decision is inconsistent with this court's precedential decisions in Atrex and Berkheimer, the court would at least have to look at that. The court might determine there is no inconsistency and therefore collateral estoppel applies. But if there is an inconsistency, as we've argued here, then, in other words, the basic requirement, and I want to be clear that there's a distinction between the collateral estoppel issue and then on the merits, but the collateral estoppel issue goes to whether the result would have been different in light of the precedential decision that this court has issued. And what we see here, there's a tremendous irony to the fact that Mr. Perry insists upon the existence of a prior trial. Because, indeed, there was a trial. And in that trial, these patents were found to be valid. As a matter of fact, they were found to be novel and non-obvious. And that is something that when Apple appealed that judgment, they did not even claim that there was inadequate evidence to support. They had other challenges, but they did not claim there was inadequate evidence to support that. And I do. Thank you, counsel, but your time has concluded. Thank you very much, Your Honor. Case number.